**James E. ULLAND, et al., Plaintiffs,**

**Charles Berg, Plaintiff, group IV, Appellant,**

**v.**

**Joan Anderson GROWE, Secretary of State, State of Minnesota, et al., Respondents.**

No. 47324.

Supreme Court of Minnesota.

Jan. 13, 1978.

Peterson, Bell & Converse and Robert C. Bell, Volunteer Atty., Minn. Civil Liberties Union, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Christopher R. Kelley, Sp. Asst. Atty. Gen., St. Paul, for respondents.

Zimmerman & Bix and Roger C. Clarke, Minneapolis, amicus curiae (seeking reversal), for League of Women Voters.

TODD, Justice.

Charles Berg and several other parties [1] brought this action against Joan Growe, Minnesota secretary of state, and others, challenging on equal protection grounds the constitutionality of the Minnesota statute which governs the placement of candidates' names on election ballots in Minnesota. Under the present statutory scheme, names of party-designated candidates must precede those of independent candidates on partisan election ballots. Berg, as an independent candidate, will never have his name appear first on a ballot. The trial court found the statute to be constitutional. We affirm.

The statute in question, presently codified as Minn.St. 203A.33, subd. 2 and 4, controls the order in which candidates' names appear on partisan election ballots.[2] The procedure of listing party-designated candidates before independent candidates is not a new one, having appeared in substantially similar form as early as 1901. See, R.L.1905, §§ 173, 174. Nonpartisan election ballots, however, are governed by the provisions of Minn.St. 203A.35, which requires that candidates' names be "rotated."[3] This section has an equally long history. See, L.1915, c. 165, § 2. Prior to 1973, legislative elections in Minnesota were nonpartisan. However, the 1973 legislature changed the law to require that its members be chosen in partisan elections. L.1973, c. 3. The 1974 election for members of the Minnesota House of Representatives was conducted pursuant to the provisions of Minn.St.1974, § 203.33, subd. 2 and 3. This statute provided in part:

"Subd. 2. At the general election, and *in the case of partisan offices only*, the names of candidates nominated by petition shall follow those of candidates nominated at primaries in the order in which the petitions are filed.

"Subd. 3. At the general election, and *in the case of partisan offices only*, the first name printed for each office, or group of names if more than one is to be voted for, for the same office, shall be that of the candidate of the political party which at the last preceding general election polled the *largest* number of votes, the same to be determined by the average vote cast for that party's candidates for partisan offices except representatives in congress. In like manner the second and succeeding lines shall be filled with the names of the candidates of

---

1. Originally, several Republican candidates were also named as plaintiffs in this action. The Independent-Republican Party of Minnesota later intervened as a plaintiff pursuant to Rule 24.02, Rules of Civil Procedure. During the pendency of the litigation, a statutory amendment was passed which obviated their constitutional claims. Consequently, these plaintiffs were dismissed from the action, leaving Berg as the sole plaintiff.

2. The term "partisan election" as used in this litigation denotes an election in which the party affiliation of each candidate is designated on the ballot.

3. Ballot "rotation" is a means for eliminating whatever element of "positional bias" may exist in an election by utilizing several different forms of the same ballot, each of which lists the candidates in a different order. See, Minn.St. 203A.23, subd. 5.

the other political parties receiving the next highest number of votes respectively. * ' * * " (Italics supplied.)

In 1975, this section was repealed and reenacted in identical language and renumbered as Minn.St.1975 Supp. § 203A.33, subd. 2 and 4. The following year, members of both the House and Senate were up for reelection. Berg was an independent candidate for reelection as state senator in the 1976 election and was defeated.

This litigation was commenced in the fall of 1975. The theory of the action as it concerned Berg was that the treatment afforded independent candidates by Minn.St. 1975 Supp. § 203A.33, subd. 2 and 4, denied them equal protection of the laws under the Fourteenth Amendment. Specifically, it was alleged that § 203A.33, subd. 2, would invariably operate to place the name of a party-designated candidate in the first position on the ballot. A "distinct advantage," it was alleged, exists in favor of the candidate whose name appears in the top ballot position.[4] The primary purpose of the action was to compel an allocation among all candidates of the presumed benefit conferred by being listed first on the ballot. Plaintiffs in the action no doubt contemplated court-ordered ballot rotation as a means for the accomplishment of this goal.

At the conclusion of testimony, but prior to the trial court's decision, the Minnesota Legislature amended Minn.St.1975 Supp. § 203A.33, subd. 4, by substituting the word "smallest" for the word "largest." L.1976, c. 224, § 3. The effect was to place the names of candidates of the political party which had polled the smallest number of votes at the preceding general election in the first position on partisan ballots. In like manner, the second and succeeding positions are filled with names of candidates of other political parties receiving succeedingly higher numbers of votes respectively. As a result, the Independent-Republican Party and its candidates dismissed their claims. Berg's constitutional claim was unaffected, however. The provision which dealt with independent candidates, § 203A.33, subd. 2, was not amended; and Berg continued to face the prospect of never having his name appear in the first position on a partisan ballot.

1. Berg's case at trial and argument before this court rested on the factual assumption that the candidate occupying the first position on the ballot will receive a substantial number of "extra" votes from voters who are either uninformed or uninterested in the candidates and habitually select the first name on the ballot. This phenomenon is referred to as "positional bias." The gravamen of Berg's equal protection claim is that by permanently denying him the first position on the ballot, § 203A.33, subd. 2 and 4, mandate an unequal division of the positional bias spoils.

Evidence was received by the trial court from several experts concerning the factors affecting the role of positional bias in an election. As is to be expected with an issue of this nature, the expert testimony was somewhat imprecise and inconclusive.[5] The parties' experts were, however, in agreement on several points which we believe important:

(1) Positional bias exists in most elections, but with a variable impact.

(2) Candidates' party affiliation is the single most important factor influencing a voter.

4. The constitutional claim of the original Independent-Republican Party plaintiffs was made on the theory that Minn.St.1975 Supp. § 203A.33, subd. 4, would systematically grant the first position on the ballot to the Democratic-Farmer-Labor candidate in every partisan election.

5. We note, however, that several of the authorities rather heavily relied upon by Berg at trial seem particularly ill-suited to an examination of the effect of § 203A.33. The Note, 45 So. Cal.L.Rev. 365, is concerned largely with nonpartisan elections. The same can be said of the study by Harry M. Bain and Donald S. Hecock, Ballot Position and Voter's Choice (Wayne State University Press, 1957). Also, the presence of possible social-cultural variables renders at least suspect any inferences drawn from an English study referred to by one of Berg's expert witnesses.

(3) Because of the importance of party affiliation, the effect of positional bias is considerably more pronounced in nonpartisan elections.

(4) The magnitude of positional bias tends to vary in inverse proportion to the visibility of a particular election. The less important (for whatever reason) the election, the greater the effect of positional bias.

(5) Numerous factors other than ballot position, including sex, ethnic background, and age, can influence an uninformed voter.

█ In sum, the expert testimony does indicate that an element of positional bias may be operating in some Minnesota elections.[6] Moreover, it is beyond dispute that § 203A.33, subd. 2 and 4, divides political candidates into two groups—party affiliated and independent—and treats those groups unequally with respect to whatever benefit positional bias may confer. But many statutes classify persons and provide for unequal treatment as between the classifications. Standing alone, such differential treatment has never been a sufficient basis for voiding a statute under the equal protection clause. *Minneapolis Federation of Teachers v. Obermeyer*, 275 Minn. 347, 354, 147 N.W.2d 358, 363 (1966). Rather, it is the function of this court to examine, under the appropriate test, the state interests which the legislature sought to advance by enacting § 203A.33, subd. 2 and 4, and

the relationship between those interests and the means employed to further them.

█ 2. The critical threshold inquiry in Berg's equal protection challenge concerns the level of scrutiny to which § 203A.33, subd. 2 and 4, must be subjected by this court. The basic principles in this area are familiar. It is well established that the exercise of the political franchise is a "fundamental right."[7] Legislative enactments which directly infringe such rights are subject to "strict scrutiny" review.[8] Thus, although the United States Supreme Court has frequently acknowledged the breadth of the states' powers over the mechanics of the electoral process,[9] regulations which have the effect of infringing the right to vote will be strictly scrutinized.[10] We must therefore select between two alternative characterizations of § 203A.33, subd. 2 and 4. Should we decide that the statute constitutes a sufficiently direct infringement on fundamental franchise rights, the "strict scrutiny" test must be employed. If, on the other hand, § 203A.33, subd. 2 and 4, are more in the nature of a simple electoral regulation, "rational basis" scrutiny is appropriate. *Meyers v. Roberts*, Minn., 246 N.W.2d 186 (1976), appeal dismissed, 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1977).

Although a number of cases contain dicta concerning the implications of positional bias,[11] only two decisions address the issue squarely and provide any guidance for our

---

**6.** We note with interest that whatever may be the effect of positional bias in Minnesota elections, it was of no moment to the DFL majority in the legislature which amended Minn.St.1975 Supp. § 203A.33, subd. 4, thereby effectively ceding to other political parties the first positions on the ballot.

**7.** The United States Supreme Court has stated that although the right to run for elected office is not a "fundamental right," it is often so closely related to voting rights that a candidate adversely affected by an unconstitutional election law may in effect assert the franchise rights of his supporters. See, *Bullock v. Carter*, 405 U.S. 134, 142, 92 S.Ct. 849, 855, 31 L.Ed.2d 92, 99 (1972).

**8.** *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

**9.** See, e. g., *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

**10.** *Williams v. Rhodes, supra.*

**11.** See, *Elliott v. Secretary of State*, 295 Mich. 245, 294 N.W. 171 (1940); *Gilhool v. Chairman & Commrs. Philadelphia County Bd. of Elections*, 306 F.Supp. 1202 (E.D.Pa.1969), affirmed, 397 U.S. 147, 90 S.Ct. 996, 25 L.Ed.2d 182 (1970); *Holtzman v. Power*, 62 Misc.2d 1020, 313 N.Y.S.2d 904 (1970); *Kautenburger v. Jackson*, 85 Ariz. 128, 333 P.2d 293 (1958); *Weisberg v. Powell*, 417 F.2d 388 (7 Cir. 1969).

inquiry. In support of Berg's position, we are referred to the California case of *Gould v. Grubb*, 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337 (1975). In that case, a candidate for the *nonpartisan* office of city counsel member in Santa Monica challenged the constitutionality of a city charter provision which adopted the state election procedure of placing incumbents' names in the first position on the ballot, followed by the names of other candidates in alphabetical order. The California Supreme Court accepted the trial court's determination that candidates in the first position on the ballot receive a significant number of "extra" votes. From this factual premise, the court reasoned that the votes of those persons who favored nonincumbent candidates were in effect "diluted" by the extra votes afforded the incumbent candidate as a result of his position on the ballot. Such dilution, it was held, is of the same character as that which the United States Supreme Court struck down in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and other legislative reapportionment cases. As a consequence, the California court invoked the strict scrutiny test and held the offending Santa Monica charter provision unconstitutional.

We decline to adopt the analysis of the *Gould* case on two grounds. First, the evidence in the instant case would not sustain the premise upon which the California decision was based. Unlike the findings in *Gould,* the testimony below, while permitting a finding that positional bias does exist, furnishes no adequate means for measuring its extent. Also, the election in *Gould* was nonpartisan. The Minnesota statute at issue here applies only to *partisan* elections. The experts at trial agreed that the effect of positional bias is much less

pronounced in partisan elections. Most significantly, the evidence clearly establishes that party designation is of far greater importance than ballot position. Taken together, these observations depict a factual setting meaningfully distinguishable from that which the California court considered.

Second, even if our facts were closer to the *Gould* case, we cannot agree that *Reynolds v. Sims, supra*, and the reapportionment cases provide the proper analytical framework for dealing with the positional bias phenomenon. The reapportionment cases are concerned with genuine arithmetical dilution, i. e., where two legislative districts of substantially unequal population size elect the same number of legislative representatives. In a very real sense, persons in the larger of two such districts get less representation per vote than persons in the smaller district. Alternatively stated, residents of the smaller district in effect cast a number of "phantom" votes. Population growth thus dilutes the "value" of the individual votes cast in the larger district, constituting a direct infringement on the right to vote.

Positional bias is not of the same nature. It does not create any "phantom" votes or reduce the value of any individual vote, because the "biased" votes themselves are cast by fully qualified voters. We know of no authority which would allow us to treat the votes of any voters, however ill-informed, as if they were somehow inferior, thereby "diluting" the effect of the more thoughtfully cast ballots. In short, the fact that some citizens may choose to vote irrationally, as is their right, does not mean that the votes of better-informed voters are arithmetically "diluted" within the language of the reapportionment decisions.[12]

12. Arithmetical dilution differs from positional bias in another practical sense. As the court stated in *Clough v. Guzzi*, 416 F.Supp. 1057, 1067 (D.Mass.1976): "The state practice here differs significantly from those in the apportionment and other voting cases where the courts have exercised strict scrutiny, in that it does not create the same kind of immutable or absolute advantage or preclusion. In the apportionment cases, the district lines and popu-

lations were fixed and the effects of malapportionment unavoidable for voters within the disadvantaged districts. In contrast, the dilution effect herein depends upon the existence of a pool of presumably uninformed voters. Yet non-incumbents and their supporters have access to those voters and may, in theory and possibly in practice, so educate them as to eliminate the donkey vote and thus eliminate the statistical position bias. Furthermore, the

Thus, even if we agreed that positional bias played a significant role in Minnesota elections, we could not concur in the California court's reliance on the reapportionment cases for a method of conceptualizing the problem. Accordingly we do not view *Gould v. Grubb, supra,* as a persuasive authority for invoking the strict scrutiny standard of review in this appeal.

Instead, we are favorably impressed with the approach taken by a Massachusetts Federal district court in the recent case of *Clough v. Guzzi,* 416 F.Supp. 1057 (D.Mass. 1976). The election statute challenged in *Clough* provided not only that the incumbents' names appear first on all ballots, but also required that the names be followed by the designation "incumbent." Thereafter, the other candidates for the office were to appear in alphabetical order. To resolve the equal protection issue, the court analyzed those decisions of the United States Supreme Court which had held unconstitutional, on Fourteenth Amendment grounds, a variety of state election statutes. We are in agreement with the court's analysis as follows (416 F.Supp. 1066):

"* * * The right to run for public office, and with it the status of candidacy, is not itself viewed as a fundamental right which in and of itself warrants strict scrutiny. * * * But a practice which, by impinging upon the status of candidacy also has the effect of placing a limitation or incidental burden on the exercise of voting rights, may be subject to rigorous judicial review. * * * Whether it is subject to such rigorous review requires an examination 'in a realistic light' of the extent and nature of the impact of the questioned practice on the right to vote. * * *

"In the instant case, we are not persuaded that the alleged burden on candidacy has a sufficient impact on the right of Massachusetts voters to choose a representative government as to warrant

strict judicial scrutiny. * * * We first note what the challenged statutes do not do; they do not impose direct restrictions on the exercise of the right to vote, e. g., *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax); they do not effectively bar candidates from an election by imposing prohibitively burdensome candidacy filing fees * * * and they do not restrict the ballot to candidates of only certain political parties. * * * Powerful restrictions of this sort have been held to have such a severe impact on the right to vote as to warrant greater judicial concern, and accordingly stricter scrutiny, lest a fundamental right be infringed."

If the Massachusetts statute under consideration in *Clough v. Guzzi, supra,* was not a sufficiently "powerful restriction" to warrant strict scrutiny on review, then Minn.St. 203A.33, subd. 2 and 4, which are less burdensome, are likewise not subject to strict scrutiny. The statute challenged in *Clough* applied to all primary and general elections, while its Minnesota counterpart applies only to partisan elections. In addition, unlike the Massachusetts statute § 203A.33, subd. 2 and 4, do not specially designate incumbent candidates. We therefore adopt the analysis of the *Clough* decision and apply the rational basis test in our evaluation of § 203A.33, subd. 2 and 4.

■ 3. In *Schwartz v. Talmo,* 295 Minn. 356, 362, 205 N.W.2d 318, 322 (1973), we stated the principles to be applied in evaluating the interests of the state in support of a legislative classification:

"* * * The rule is that legislative classification will be held to be constitutionally valid if—

"(1) the classification uniformly, without discrimination, applies to and embraces all who are similarly situated with respect to conditions or wants justifying appropriate legislation;

impact of the Massachusetts statutes on the total vote is not so clear that we can really define with anything approaching certainty, as would be possible in the apportionment cases, how significantly the state is directly affecting

the weight of anyone's vote. The principle of dilution as affecting the fundamental right to vote would seem better reserved for the more clear-cut and certain cases of inequality."

"(2) the distinctions which separate those who are included within the classification from those who are excluded are not manifestly arbitrary or fanciful, but are genuine and substantial so as to provide a natural and reasonable basis in the necessity or circumstances of the members of the classification to justify different legislation adapted to their peculiar conditions and needs; and

"(3) the classification is germane or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the remedy or regulations therefor which the law purports to provide."

Berg argues that the evidence in this case is not sufficient to establish a rational basis for the classification in § 203A.33, subd. 2 and 4. We disagree. A review of the record discloses evidence sufficient to meet the criteria of *Schwartz*, although it must be observed that more detailed information could have been produced from the evidence available. The fact that party designation, not ballot position, is the most substantial influencing factor supports the legislative determination expressed by § 203A.33, subd. 2 and 4. The expert testimony at trial reveals that over two-thirds of the voters in Minnesota identify with a major political party. The method selected by the legislature to assist partisan voters in locating their candidates on the ballot cannot be overturned by this court merely because we think a rotation system would be marginally more fair. We are mindful of the proper role of an appellate court conducting a "rational basis" review of a legislative enactment. It is the function of the legislature to make classifications; and our past decisions make it clear that the legislature is not required to adopt the means which this court thinks best for furthering the state's interests. As we said in *Minneapolis Federation of Teachers v. Obermeyer*, 275 Minn. 347, 354, 147 N.W.2d 358, 363:

"* * * Courts are not to weigh the merits of a classification in the judicial balance and to reject it merely because they might favor a different standard."

Further, we agree with the court in *Clough v. Guzzi*, 416 F.Supp. 1057, 1068, when it said:

"* * * The fact that some statistical advantage may at the same time accrue to one of the candidates by virtue of his or her incumbency does not for constitutional purposes invalidate that otherwise legitimate purpose, especially where that advantage remains problematic and variable from election to election. And whether for purposes of a more absolute fairness that advantage warrants a different statutory scheme is properly a legislative consideration."

We therefore hold that Minn.St. 203A.33, subd. 2 and 4, satisfy the constitutional standards we have prescribed and conclude that any deviation from the present method of assigning ballot position is properly a matter for legislative determination.

The decision of the trial court is affirmed.

OTIS, J., took no part in the consideration or decision of this case.