Bonn H. CLAYTON, Petitioner,

v.

Mary KIFFMEYER, in her official capacity as Secretary of State, and Mark Lundgren, Carver County Auditor, individually and on behalf of all other county chief election officials, Respondents.

No. A04–1311.

Supreme Court of Minnesota.

Oct. 28, 2004.

Gregory F. Wersal, Minneapolis, MN, for Petitioner.

Kristine Lee Eiden, Office of the Attorney General, St. Paul, MN, Michael A. Fahey, Carver County Attorney, Chaska, MN, for Respondents.

David Minge, St. Paul, MN, Paul Ross, Jordan, MN, for Interested Observers.

## OPINION

BLATZ, Chief Justice.

On July 21, 2004, petitioner Bonn Clayton filed a petition under Minn.Stat. § 204B.44 (2002) against respondents Mary Kiffmeyer, in her official capacity as Secretary of State, and Mark Lundgren, Carver County Auditor, individually and on behalf of all other county chief election officials, asking this court to direct respondents to omit from ballots prepared for the 2004 election the name of David Minge as a candidate for the office of Judge of the Minnesota Court of Appeals—Second Congressional District (Seat 3) or to provide alternative relief requested in the petition. Petitioner alleges, inter alia, that Judge Minge did not reside in the second congressional district for one year prior to his appointment to the Minnesota Court of Appeals and did not reside in the second congressional district after January 3, 2004, and is therefore not eligible to run as a candidate for the second congressional district seat on the court of appeals. After respondents and the candidates filed responses to the petition and petitioner filed a reply memorandum, oral argument was heard on August 9, 2004. This opinion confirms the order filed on August 13, 2004, denying the petition.

The petition alleges the following:

On March 19, 2002, the Special Redistricting Panel appointed by Chief Justice Kathleen Blatz filed its "Final Order Adopting a Congressional Redistricting Plan" that established new boundaries for

the eight Minnesota congressional districts. *Zachman v. Kiffmeyer*, Case No. C0–01–160 (Minn. Spec. Redist. Panel March 19, 2002). On April 24, 2002, Governor Jesse Ventura appointed David Minge to replace retiring Judge Gary Crippen on the court of appeals, effective May 15, 2002. Judge Crippen had occupied the seat on the court of appeals designated for the second congressional district. At the time of appointment, David Minge was a resident of Chippewa County, which was in the seventh congressional district under the 2002 redistricting plan. Judge Minge did not reside in the redrawn second congressional district at the time of his appointment or for one year prior to his appointment.

On June 4, 2004, the Secretary of State issued a "Notice of Offices to be Filled at the State General Election for which Candidates File with the Secretary of State," designating "seat 3" on the Minnesota Court of Appeals as the office pertaining to the second congressional district. On July 6, 2004, David Minge filed an affidavit of candidacy for the office of court of appeals judge—seat 3, listing his residence as St. Paul, Minnesota, which is in the fourth congressional district. July 20, 2004, the last day for filing, Paul Ross, who resides in the second congressional district, filed an affidavit of candidacy for the office of court of appeals judge—seat 3. The Secretary of State accepted both filings.

On July 20, Mark Wersal, who resides outside the second congressional district, filed an affidavit of candidacy for the office of court of appeals judge—seat 3. Wersal's affidavit of candidacy was rejected by the Secretary of State because he is not a resident of the second congressional district. Petitioner is a qualified voter in the second congressional district. He alleges that if given the choice between Judge Minge and Mark Wersal, he would vote for Wersal for the court of appeals seat.

The errors and omissions alleged concern "Seat 3" on the Minnesota Court of Appeals that is open for election in 2004. Several of the issues raised in the petition involve interpretation and application of Minn.Stat. § 480A.02, subd. 3 (2002), which provides for designation of an individual seat on the court of appeals for each congressional district in the state and establishes eligibility requirements related to those designated seats. Section 480A.02, subdivision 3 provides:

> By January 1, 1984, one seat on the court shall be designated for each congressional district. Only persons who have resided in that congressional district for at least one year shall be eligible for election or appointment to that seat. A judge who is elected or appointed to a congressional district seat shall continue to be eligible for that seat without regard to any subsequent change of residence. All other seats shall be without restriction as to residence.

Minn.Stat. § 480A.02, subd. 3 (2002).

The petition asserts five claims. Claim I alleges that Judge Minge has never had a legal residence in the current second congressional district and therefore does not satisfy the requirement in section 480A.02, subdivision 3, that to be eligible for election to a court of appeals seat designated for a congressional district, a person must have resided in that congressional district at least one year. Claim II asserts that because Judge Minge's initial appointment was invalid, the provision in section 480A.02, subdivision 3, that a judge who was appointed to a congressional district seat on the court of appeals continues to be eligible for that seat without regard to any subsequent change of residence does not apply to Judge Minge. The petition asserts that the initial appointment

was invalid based on the contention that after the filing of the redistricting panel's congressional redistricting plan on March 19, 2002, the governor could no longer make court of appeals appointments based on the previous congressional districts. Petitioner alleges that because Judge Crippen at the time of his appointment resided in Nobles County, which is in the newly-drawn first congressional district, to satisfy the residency requirement his successor would have to have lived for a year in the first congressional district. According to the petition, because Judge Minge lived at the time in the newly-drawn seventh congressional district, he was not properly appointed in 2002, and therefore the continued-eligibility-despite-change-in-residence clause does not apply to him.

Claim III asserts that because the 2002 appointment was invalid, Judge Minge cannot be a candidate to "succeed again" and is therefore not entitled to the "incumbent" designation on the ballot provided for in Minn.Stat. § 204B.36, subd. 5 (2002).[1] Claim IV alleges that by allowing Judge Minge, a nonresident of the second congressional district, to run for the second congressional district seat while prohibiting Mark Wersal from appearing on the ballot because he is not a resident of the second congressional district, Minn. Stat. § 480A.02, subd. 3, denies petitioner the equal protection of the laws. Finally, Claim V alleges that allowing Judge Minge to run for the second congressional district seat even though he never resided in the newly-constituted second congressional district denies petitioner's right to a republican form of government guaranteed under the United States Constitution, art. IV, § 4, and further alleges that requiring nonincumbent challengers to reside in the designated congressional district while allowing voters from throughout the state to cast ballots for the office violates the provisions of article I, section 2, and article VII, section 6, of the Minnesota Constitution.

The petition requests alternate forms of relief. First, Judge Minge should be omitted from the 2004 ballot as a candidate for the second congressional district seat. Second, if the court concludes that Judge Minge was improperly appointed in 2002 but can remain on the ballot, he should not be designated on the ballot as an incumbent. Third, if the court concludes that Judge Minge was improperly appointed in 2002 and the designation of the vacancy was improper, the seat should be omitted from the ballot and the governor should be required to appoint a successor to Judge Crippen from the first congressional district (and apparently, Judge Minge should be removed from office). Fourth, if the court concludes the residency restriction of Minn.Stat. § 480A.02, subd. 3, unconstitutional, anyone who is otherwise qualified to hold office and attempted to timely file an affidavit of candidacy should be placed on the ballot; in this instance, Mark Wersal.

I.

Respondents raise two procedural arguments which they contend warrant dismissal of the petition. These arguments are that the petition should be dismissed, first, because it was brought in bad faith and, second, based on laches.

Respondents argue that the petition was filed in bad faith "for political purposes to manipulate the election process." Factually, respondents allege that petitioner, his attorney Greg Wersal, Wersal's brother

---

1. Minnesota Statutes § 204B.36, subd. 5 (2002) provides: "If a chief justice, associate justice, or judge is a candidate to succeed again, the word 'incumbent' shall be printed after that judge's name as a candidate."

Mark Wersal, and Paul Ross, a candidate for the second congressional district seat, are all political associates who conspired in this action. The alleged conspiracy involved having the brother of petitioner's attorney, who was not a resident of the second congressional district, file for the second congressional district seat on the last day of filings knowing that his affidavit of candidacy would be rejected, and having Paul Ross, a resident of the second judicial congressional district, file for the seat minutes later. According to respondents, "[p]etitioner and his attorney launched the present action in an effort to remove Judge Minge's name from the ballot so that Mr. Ross would be the only candidate for Seat 3 on the Court of Appeals." They assert that the petition should be dismissed because of this alleged bad faith, but cite no cases or other authority for such a dismissal.

Petitioner asserts that there could not have been a conspiracy as alleged because he did not speak with Greg Wersal about the issues in this case until July 14, 2004, when he hired Wersal after being turned down by a different attorney.[2]

█ Respondents also assert that the petition should be dismissed based on the doctrine of laches. Laches is an equitable doctrine applied to "prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay." *Winters v. Kiffmeyer*, 650 N.W.2d 167, 169 (Minn.2002) (quoting *Aronovitch v. Levy*, 238 Minn. 237, 242, 56 N.W.2d 570, 574 (1953)). We have acknowledged the particular importance of laches in ballot challenges because of the severe time constraints facing officials in this type of challenge. *Id.* "[T]he practical question in each case is whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for." *Id.* at 170 (quoting *Fetsch v. Holm*, 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952)).

Respondents argue that the delay here has been unreasonable because a challenge to the validity of Judge Minge's 2002 appointment could have been brought any time in the last two years and because petitioner's attorney was told in February, in a response to his inquiry to the Secretary of State, that Judge Minge would be designated as the incumbent on the 2004 ballot for the second congressional district seat. Respondents argue that the Secretary of State and county auditors will be prejudiced by petitioner's delay because of the deadlines for notification to county auditors of the names that are to appear on ballots, for printing ballots and for preparation of absentee ballots, and the electorate will be prejudiced if relief is granted on the unreasonably delayed claims because the electorate will be deprived of a contested ballot for the second congressional district seat as a result of petitioner's "trickery."

On the facts, petitioner argues that he could not have brought this action earlier because he first learned of Judge Minge's residency outside the second congressional district on July 12, when petitioner returned from out of town after Judge Minge had filed his affidavit of candidacy on July 6. He contends that he acted with due haste by seeking and obtaining an attorney within days.

A ruling on either the bad faith or the laches argument in this case would appear

---

**2.** We note that the candidate filings by Mark Wersal and Paul Ross occurred on July 20, 2004.

to require determination of disputed facts. Because of the need for an expeditious ruling, we deem it more beneficial to an orderly and fair electoral process to address the merits, rather than incur the delay inherent in a fact-finding proceeding. We reiterate, however, that because of the time constraints implicit in ballot challenges, we will not hesitate to "examine[] applications for relief not only on their merits, but also from the perspective of whether the applicant acted promptly in initiating proceedings." *Id.* at 169–70 (quoting *Peterson v. Stafford,* 490 N.W.2d 418, 419 (Minn.1992)).

## II.

### A. *Validity of the 2002 Appointment.*

Judge Minge was appointed to the court of appeals on April 24, 2002, effective May 15, 2002. At the time, Judge Minge resided in Montevideo, which was then within the second congressional district as designated after the 1990 census, but was within the seventh congressional district under the redistricting order filed March 19, 2002.

Petitioner argues that Judge Minge's appointment to the court of appeals in April 2002 was invalid because he was not a resident of the second congressional district as that district was redrawn in the 2002 redistricting order.[3] Petitioner contends that the redistricting order applied to this appointment because the order was effective immediately and was therefore effective not just for future elections, but also for future appointments. He contends that if Judge Minge had been running for election from the second congres-sional district, he would not have been eligible, and he should not be treated differently just because he was appointed to the office.

Respondents contend that petitioner's argument that the realigned congressional districts became effective for appointment purposes immediately upon the filing of the March 19, 2002 order of the redistricting panel is wrong. Rather, respondents contend that the order had only prospective effect, beginning with the next election cycle. They point out that the order itself explained that it was applicable to future elections:

> Because we previously held that the current congressional districts are inappropriate *for use in future elections, see* Scheduling Order No. 2, *supra,* at 2, we enjoin the defendants and the class of election officials they represent from conducting congressional elections using the current congressional districts or any congressional redistricting plan other than that which we hereby adopt.

*Zachman v. Kiffmeyer,* No. C0–01–160, at 9 (Minn. Spec. Redist. Panel March 19, 2002) (Final Order Adoption a Congressional Redistricting Plan) (emphasis added). Respondents also cite statutes, *e.g.,* Minn.Stat. § 204B.14, subd. 1a (2002) (stating that redistricting should be accomplished in time to allow precinct boundaries to be redrawn for election years "ending in two"), case law, *e.g., State ex rel. Norwood v. Holden,* 45 Minn. 313, 47 N.W. 971 (1891) (holding that an order redistricting a county was merely prospective as to qualifications of county commissioners and did not affect the right to

---

3. In the petition, petitioner alleges that because retiring Judge Crippen lived in the redrawn first congressional district, his successor would have to live in the same district. However, the residency requirement would be determined based on the designation of the seat to which Judge Crippen was initially appointed or elected, and that was the second congressional district. Petitioner may have conceded this, as his reply memorandum does not mention the first congressional district.

office of those previously elected), and Opinions of the Attorney General, *e.g.*, Op. Att'y Gen., No. 126–F (Jan. 4, 1932) (stating that redrawn county districts were effective only at the next general election and not for the purpose of filling a vacancy caused by the death of a commissioner after the redistricting order was filed), that establish the prospective character of redistricting orders. Based on this authority, respondents contend that the March 19, 2002 redistricting order did not become effective until the 2002 elections, and therefore the existing congressional district boundaries applied at the time of Judge Minge's appointment. They conclude that because Judge Minge resided in the then-existing second congressional district, his appointment was proper.

Petitioner argues that the authority respondent cites is distinguishable because it all addresses the effect of redistricting on *current* terms of office. Petitioner argues that in contrast, Judge Crippen's term expired when he left office and Judge Minge was appointed to a new term of office.[4] Petitioner asks that the redistricting order apply to all newly-elected and newly-appointed offices after the date of the order.

 Petitioner's argument that the new congressional district boundaries should have been applied in appointing a successor for Judge Crippen is mistaken. The issue must be viewed not just in terms of applicability of the redistricting order to future elections, but its applicability to those holding office and when those district boundaries became effective in terms of holding office. Respondents are correct in pointing out that redistricting orders have consistently been held to apply to future elections and obviously do not change the boundaries with regard to incumbent office holders. The significant point is that although the subsequent elections are held based on the redistricting order, the redrawn congressional districts do not take effect in terms of sitting office holders until the term of office begins following that next set of elections. That is, when the successful candidates at the election subsequent to redistricting take office, they do so as the representatives of the redrawn districts, and those districts therefore become effective for purposes of holding office at that time, not earlier. Thus, until the congressional representatives elected based on the new boundaries took office, the congressional districts remained configured, for purposes of current officeholders, as they had been prior to the redistricting order. Accordingly, at the time Judge Minge was appointed, the second congressional district was still configured as it had been before the redistricting order, both with respect to the member of congress representing that district and with respect to Governor Ventura's appointment of a judge who resided in that district.

 Petitioner bases his argument that the governor could not make an appointment to the court of appeals based on the preexisting congressional district lines in

---

4. Although it is true that a judge appointed to fill a vacancy does not simply serve out the remaining term of the predecessor judge, petitioner's argument that the appointed judge immediately starts a new term ignores the provisions of our constitution on the subject. The Constitution provides that when a vacancy occurs in the office of judge the governor shall appoint a person to fill the vacancy "until a successor is elected and qualified." Minn. Const. art VI, § 8. It further provides that "[t]he successor shall be elected for a six year term at the next general election occurring more than one year after the appointment." *Id.* Although we need not decide the issue to resolve this case, it therefore appears that a new term for the vacated position starts with the election of a successor and not with the appointment of a person to fill the vacancy.

part on the argument that those boundaries "were not constitutionally valid" after the special redistricting panel issued its final order. The fallacy in this argument is that the constitutional aspect of the panel's ruling was of no relevance to a judicial appointment. The congressional districts had to be redrawn after the 2000 census to satisfy the constitutional one-person, one-vote standard. *See Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). However, the one-person, one-vote requirement does not apply to judicial elections because judges do not serve in a truly representative capacity. *See Holshouser v. Scott*, 335 F.Supp. 928, 930 (M.D.N.C.1971) ("We find no case where the Supreme Court, a Circuit Court, or a District Court has applied the 'one man, one vote' principle or rule to the judiciary."), *aff'd*, 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972).

Instead, the legislature provided in section 480A.02, subdivision 3, for designation of some of the court of appeals seats by congressional district, not so that judges would represent the constituents in those districts, but simply to utilize those districts and their boundaries as established benchmarks for providing geographic diversity on the court. The legislature could as easily have used the state's judicial district boundaries for that purpose. Indeed, voting for district-designated court of appeals seats is statewide, rather than by district, negating any narrow representational design. *See* Minn.Stat. § 480A.02, subd. 4 (2002) ("All judges [of the court of appeals] shall be subject to statewide election, whether they serve in at-large or congressional district seats."). *See also Dusch v. Davis*, 387 U.S. 112, 115–16, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967) (rejecting one-person, one-vote challenge to election of city council members based on residence in unequally populated boroughs because despite the borough res-

idency requirement, voting for all candidates was city-wide, and therefore the plan used boroughs "merely as the basis of residence for candidates, not for voting or representation.") Because the congressional districts serve only this geographical, rather than a representational, purpose with respect to court of appeals seats, the fact that the existing boundaries would be unconstitutional as applied to future elections had no impact on their viability for purposes of a present gubernatorial appointment.

For these reasons, we conclude that the 2002 appointment was properly based on the existing second congressional district, rather than the redrawn district. Judge Minge therefore satisfied the residency requirement at the time of his appointment.

Two of petitioner's claims are premised on his argument that the 2002 appointment of Judge Minge was invalid. Because we conclude that the appointment was valid, those claims must fail.

█ First, petitioner's contention that Judge Minge is not eligible to run for the second congressional district seat in this election because he does not satisfy the residency requirement is based on the invalid-appointment argument. Petitioner contends that because Judge Minge was not properly appointed to the second congressional district seat in 2002, he cannot take advantage of the "change of residence" exception to the residency requirement in Minn.Stat. § 480A.02, subd. 3, for "[a] judge who is elected or appointed to a congressional district seat." Because Judge Minge was validly appointed to the second congressional district seat in 2002, under section 480A.02, subdivision 3, he continues to be eligible for that seat "without regard to any change of residence."

Second, petitioner argues that even if Judge Minge is allowed to remain on the

ballot, he should not be designated on the ballot as the incumbent as provided in Minn.Stat. § 204B.36, subd. 5, because due to the invalidity of his appointment, he cannot be considered "a candidate to succeed again." Because the appointment was valid, this argument too must fail.

### B. *Guaranty Clause.*

Petitioner claims that the statutory structure of limiting candidates to residents of a congressional district while allowing statewide voting for the position violates Art. IV, § 4, of the United States Constitution, which guarantees a republican form of government (the Guaranty Clause). In addition, petitioner argues that allowing an incumbent judge to move out of the congressional district deprives voters of the right to be represented for a fixed term, which petitioner contends also violates the Guaranty Clause.

Respondents argue that the Guaranty Clause does not require any particular method for election of judges and cite two federal district court cases rejecting Guaranty Clause challenges to a state's method of electing judges. Petitioner does not cite any cases that directly support his Guaranty Clause claims.

■ The conclusive and unavoidable flaw in petitioner's Guaranty Clause argument is that the United States Supreme Court has long and consistently held that Guaranty Clause claims do not present justiciable controversies that can be adjudicated by the courts. Rather, the Guaranty Clause provides a political guarantee that must be addressed through the political process. *See, e.g., Baker v. Carr,* 369 U.S. 186, 223, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). As respondents point out, this court has followed the Supreme Court's lead in holding that Guaranty Clause claims present a political ques-

tion not to be adjudicated by the courts. *State ex rel. Peterson v. Quinlivan,* 198 Minn. 65, 74, 268 N.W. 858, 863 (1936). Given the long-established Supreme Court precedent, petitioner's Guaranty Clause claims are without merit.

### C. *Equal Protection Claim.*

Petitioner also argues that Minn.Stat. § 480A.02, subd. 3, violates the Fourteenth Amendment guarantee of equal protection by creating two classes of candidates for a congressional district-designated seat on the court of appeals and treating them differently. One class identified by petitioner is the incumbent judge, who is exempted from the congressional district residency requirement by the provision in subdivision 3 that provides: "A judge who is elected or appointed to a congressional district seat shall continue to be eligible for that seat without regard to any subsequent change of residence." The other class is all other potential candidates, who must satisfy the residency requirement of living in the congressional district for at least one year before the election for the designated seat. Although there is some ambiguity in his position, it appears that petitioner is not challenging the constitutionality of imposing a one-year residency requirement for the congressional district-designated judgeships per se, but only the differential treatment that the requirement is waived for an incumbent but applied to all new candidates for the office.

Respondents argue that there is no differential treatment, because all new candidates or applicants for a designated seat must satisfy the statutory requirement of having resided in the congressional district for one year preceding their election or appointment. In respondents' view, an incumbent can be exempted from the residency requirement when running for re-election because he or she has already

satisfied the requirement prior to his or her appointment or initial election. Petitioner, on the other hand, focuses on the fact that an incumbent candidate and a nonincumbent candidate are treated differently in terms of access to the current ballot. We need not resolve whether the respondents' or petitioner's perspective is correct on this point, because, as explained *infra*, the statutory scheme passes equal protection muster even if viewed as creating two classes of candidates.

We must first determine under what standard petitioner's equal protection claim should be reviewed. Petitioner contends we must apply strict scrutiny, assessing whether the statute serves a compelling state interest, because the residency requirement "infringe[s] upon the exercise of the fundamental right to be a candidate for public office." Petitioner cites several cases in which federal and state courts have applied strict scrutiny to candidate residency requirements. *E.g., Cowan v. City of Aspen,* 181 Colo. 343, 509 P.2d 1269 (1973); *Chimento v. Stark,* 353 F.Supp. 1211 (D.N.H.), *aff'd,* 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973). Although some of the cases cited by petitioner rely on the right to candidacy as the basis for strict scrutiny, most rely on a confluence with other fundamental rights that are affected by the candidate residency requirement, such as the right to vote or the right to interstate travel. For example, in *Chimento,* the federal district court noted the interrelationship between the right to vote and the right to candidacy and held that strict scrutiny would be applied to the seven-year residency requirement to run for Governor of New Hampshire because the requirement limited voters in their

choice of candidates. 353 F.Supp. at 1214.

Respondents argue that rational basis scrutiny is required because the right to candidacy is not a fundamental right. Respondents rely on *Ulland v. Growe,* 262 N.W.2d 412 (Minn.1978), and *Peterson v. Stafford,* 490 N.W.2d 418 (Minn.1992). In both of those cases, the candidates' equal protection challenges were reviewed using the rational basis standard. However, those cases do not resolve the issue before us here because neither involved a statute that denied a candidate access to the ballot. Instead, the issue in each case was only the format of the ballot.[5]

Petitioner's invocation of the right to run for public office as a fundamental right that requires strict scrutiny is unavailing for several reasons. First, petitioner has not alleged that he is a potential candidate for judicial office and therefore cannot claim that *his* right to run for the court of appeals' second congressional district seat is infringed, and he has cited no authority conferring upon a voter standing to assert the rights of others to run for office. More importantly, although some lower courts have treated the right to candidacy as a fundamental right, the Supreme Court has declined to do so. *See Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (plurality opinion); *id.* at 977 n. 2, 102 S.Ct. 2836 (Brennan, J., dissenting) (noting "we have never defined candidacy as a fundamental right * * *."); *Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

Based on a careful review of the case law, particularly that of the Supreme Court, we are convinced that this case does not present the rigid choice between strict scrutiny and rational basis review

---

**5.** In *Ulland,* the issue was the order in which the candidates' names would appear on the ballot, 262 N.W.2d at 413, and in *Peterson,* the issue was designation of an incumbent judge as the incumbent on the ballot, 490 N.W.2d at 419.

that the parties offer. Rather, in assessing ballot access cases, the Supreme Court has embraced a more flexible approach.

In *Bullock v. Carter*, the Supreme Court addressed a challenge to the candidate filing fees imposed by Texas statutes for access to the ballot for primary elections, with fees going as high as $8,900. 405 U.S. at 135–40, 92 S.Ct. 849. In addressing the threshold question of whether rational basis or strict scrutiny should be applied, the Court explained:

> The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. * * * Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might chose. The existence of such barriers does not itself compel close scrutiny. In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

*Bullock*, 405 U.S. at 142–43, 92 S.Ct. 849 (footnotes and citations omitted). In examining the extent and nature of the Texas filing fee requirement on voters, the Court concluded that the effect would be to substantially limit the voters' choice of candidates. *Id.* at 143–44, 92 S.Ct. 849. The Court also repeatedly emphasized that because of the size of filing fees required, the impact of the system would fall most heavily on those without adequate economic resources. *Id.* This combination of factors, limitation on the voters' choice of candidates based on economic status, led the Court to reject rational basis review:

> Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude * * * that the laws must be "closely scrutinized" and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster.

*Id.* at 144, 92 S.Ct. 849. Ultimately, the Court held that the state's rationale for the filing fee system, although rational, was not sufficiently necessary to satisfy strict scrutiny. *Id.* at 147–49, 92 S.Ct. 849.

In *Anderson v. Celebrezze*, the Supreme Court again explained that "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or choose among candidates." 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). The Court explained that it has recognized that states must engage in substantial regulation of elections to ensure that they are fair and honest and orderly. *Id.* Rejecting a "litmus-paper test" to determine the validity of such regulations, the Court stated that:

> [a court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the ex-

tent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. 1564.

In *Burdick v. Takushi*, the Supreme Court again rejected the notion that a law that imposes any burden on the right to vote must be subject to strict scrutiny. 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The Court reviewed the approach used in *Anderson* and reiterated that "the mere fact that a State's system 'creates barriers * * * tending to limit the field of candidates from which voters might choose * * * does not of itself compel close scrutiny.'" *Id.* at 433, 112 S.Ct. 2059 (quoting *Bullock*, 405 U.S. at 143, 92 S.Ct. 849). The Court reemphasized the "more flexible standard" it adopted in *Anderson*, and explained:

[A]s the full Court agreed in *Anderson*, a more flexible standard applies. * * *.

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory inter-

ests are generally sufficient to justify" the restrictions.

*Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (citations omitted). We will apply this "more flexible standard" to petitioner's equal protection challenge.

■ Applying the approach employed by the Supreme Court to the challenged candidate restrictions, we first "examine in a realistic light the extent and nature of their impact on voters." *Bullock*, 405 U.S. at 143, 92 S.Ct. 849. This is somewhat difficult to assess because, as noted, petitioner does not really appear to challenge the one-year residency requirement that imposes the restriction on candidate access to the ballot, but instead challenges the current exemption from that restriction for an incumbent candidate who previously satisfied it. Nevertheless, to the extent that the impact of the residency requirement is part of the analysis, we perceive that it fails to have a significant limiting effect on the candidates available to voters. First, it is a residency requirement of relatively short duration. We note that in *Chimento*, one of the cases relied on by petitioner, a seven-year residency requirement to run for Governor of New Hampshire was upheld, even when tested against the strict scrutiny standard. 353 F.Supp. at 1217. The court there concluded that the lengthy residency requirement "has only a negligible impact on the voters' right to have a meaningful choice of candidate for Governor." *Id.*[6] In another strict scrutiny case relied on by petitioner, the Colorado Supreme Court struck down a three-year residency requirement for candidates for mayor and city council, but upheld a one-year statutory residency re-

---

**6.** The court also explained that "the seven year period does not act as an outright ban on anyone's candidacy for Governor; rather, it delays the eligibility of a candidate to the office of Governor until a time when he has been a resident of the State for seven years. While we recognize that seven years may be a long wait for one aspiring to the office of Governor, it is not a complete barrier to that office." *Chimento*, 353 F.Supp. at 1216.

quirement for running for municipal office as satisfying the state's compelling state interests. *See Cowan v. City of Aspen*, 509 P.2d at 1273. Further reducing the impact of the residency requirement on the voters' choice of candidates is the fact that candidates may run for the same position of judge of the court of appeals by filing for an at-large seat that has no residency requirement. Because of the availability of at-large seats, the unavailability of any particular candidate is due not to the residency requirement, but to the candidate's choice not to run for an at-large seat.[7] Given the relatively short duration of the residency requirement and the availability of at-large seats, we conclude that the limiting effect on voters' choice of candidates is not significant.

The next step in our analysis is to assess the purposes that are served by the challenged statutory scheme. Respondents contend that the purpose served by the designation of one seat on the court of appeals for each congressional district and requiring residency in the district for one year prior to election or appointment is to provide geographic diversity on the court of appeals. That is, the intent of the legislature was to avoid having the entire court of appeals appointed or elected from the same region of the state, presumably the metropolitan area.

Petitioner argues that this interest in geographic diversity cannot be viewed as compelling, or even rational, because it does not apply to a person who was previously appointed or elected to the court when he runs for reelection. In this sense, the question is whether there is a legitimate government purpose for exempting an incumbent judge from continuing to satisfy the residency requirement that does not undermine the validity of the geographic diversity goal.

■ Respondents argue that the reason incumbent judges remain eligible for their designated seats despite a change in residence is to enable judges who are from distant districts to move closer to the location of the court of appeals in St. Paul once they have taken office, without sacrificing their eligibility to run for reelection. Respondents point out that the court of appeals sits in continuous session in St. Paul throughout the year and therefore it would be difficult for a judge to fulfill his or her responsibilities without relocating to the St. Paul vicinity. In fact, judges of the court of appeals are required by statute to "maintain their permanent chambers at St. Paul." Minn.Stat. § 480A.05 (2002). If the statute did not allow a change in residence without losing eligibility for the judge's designated seat, there would be constant turnover in the judges holding those offices. By allowing judges to move closer to St. Paul without sacrificing their eligibility, the statute serves the purpose of fostering stability on the court, which is a legitimate goal, as long as it is not accomplished at the cost of unfairly disadvantaging nonincumbents. Here, nonincumbents are not unfairly disadvantaged by the statute because, as noted earlier, all candidates for court of appeals judgeships are treated equally in that they all must have resided in the congressional district for a year before their initial appointment or election.

The exemption of incumbents from a continued residency requirement also

**7.** It is theoretically possible that there could be elections in which no at-large seats are on the ballot, but that is not the case in the election before us here. There are three at-large seats on the ballot this year and only two designated seats. In the 20 years since the court of appeals was created, there have been no elections at which only designated seats were on the ballot.

serves the important purpose of facilitating recruitment of out-state attorneys as candidates for appointment or election to the court of appeals. There would be a strong disincentive against serving on the court of appeals if candidates who were asked to give up their law practice to serve were then made ineligible for subsequent election to the court by the necessary move to the St. Paul area.

Moreover, contrary to petitioner's argument, exempting incumbents from a continuing residency requirement does not vitiate the goal of geographic diversity. Petitioner argues that as structured, the residency requirement does not serve the purposes of keeping the candidate familiar with the concerns of the voters of the congressional district or maintaining a presence that allows voters in the district to be familiar with the judge. These are different goals than the geographic diversity purpose articulated by respondents. These are goals that are better suited to a residency requirement for a public official who is expected to represent the voters of a particular district, as would a member of a legislative body. However, a judge does not serve in that same type of representative capacity, even in the seats that are designated for congressional districts. The fact that judges in district-designated seats are elected by statewide vote belies any suggestion that they are intended to "represent" the designated district. More importantly, the judicial function requires that they serve the entire state; their responsibility is to apply the law even-handedly, rather than representing their supporters or their congressional district "constituents."

Thus, the residency requirement for designated seats on the court of appeals is not intended to facilitate the type of representation of district voters that would be appropriate for legislative office. Rather,

its purpose is to provide geographic diversity on the court of appeals in terms of background and exposure to the issues, concerns, and legal practices in the different areas of the state. However, because there is no intent that the judge elected from a designated district will serve in a truly representative capacity for that district, there is not the same need for a continuing link with the district as there would be with legislative office.

The question remains what legitimate governmental purpose is served by exempting only the incumbent judge from the immediate residency requirement. That is, why does the previous residence of a challenger in the congressional district not serve the purpose of geographic diversity equally well? The answer is twofold. First, an incumbent judge is exempted from a continuing residency requirement because that exemption is necessary to serve the purpose of facilitating stability on the court of appeals, as described above. Exempting a nonincumbent from the residency requirement does not serve that purpose at all. Second, by requiring the year of residency within the congressional district contemporaneous to the time the judge initially takes office by appointment or election, the statute assures that the benefit of geographic diversity is still a fresh part of the judge's makeup when he or she assumes the judicial role. If all candidates could satisfy the requirement with past residency in the district, it is possible there would never be a current resident of the district sitting on the court.

As we have concluded, Minn.Stat. § 480A.02, subd. 3, does not have a significant impact on petitioner's right to vote because it has limited effect on his choice of candidates. Moreover, to the extent there is any impact, it is not the result of an invidiously discriminatory factor, such as the wealth factor in *Bullock v. Carter*,

405 U.S. at 149, 92 S.Ct. 849. Because the statute does not impose "severe" restrictions, but rather "reasonable, nondiscriminatory restrictions," the state's "important regulatory interests" are sufficient to justify the restrictions. *See Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. Here, the state's interests of providing geographic diversity on the court of appeals while preserving some measure of judicial stability are important regulatory interests that are served by the statutory scheme. They are sufficient to justify the restrictions imposed. Accordingly, Minn.Stat. § 480A.02, subd. 3, survives petitioner's equal protection challenge.

### D. *Violation of Minn. Const. art. VII, § 6.*

Finally, petitioner argues that Minn. Stat. § 480A.02, subd. 3, violates Minn. Const. art. VII, § 6, which provides:

> Every person who by the provisions of this article is entitled to vote at any election and is 21 years of age is eligible for any office elective by the people in the district wherein he has resided 30 days previous to the election, except as otherwise provided in this constitution, or the constitution and laws of the United States.

Petitioner claims this provision is violated in three ways. First, the statute creates a residency requirement of one year, where the constitution provides that the residency requirement can be no longer than 30 days. Second, despite the fact that voters from across the state can vote for the office, the statute limits candidates to those who have resided in the congressional district for a year. This is alleged to contravene the constitutional provision that allows a candidate to run for any office elected by the people of the district in which he has resided for 30 days prior to the election. Third, the constitutional provision creates a minimum requirement for eligibility of 30 days residence that is violated by the statutory exemption that allows an incumbent to run from the congressional district even if he or she no longer lives there.

■ Respondents argue that petitioner's article VII, section 6 claim fails to acknowledge that article VI, section 7, of the Minnesota Constitution provides that judges "shall be elected by the voters from the area which they are to serve *in the manner provided by law.*" (Emphasis added). Respondents contend that this provision grants the legislature authority to decide the manner in which judges on the court of appeals are elected, and the legislature has done so in Minn.Stat. § 480A.02, subd. 3. In opposing respondents' position, petitioner argues that article VI, section 7, is a "general" provision that cannot grant the legislature authority to override the "specific" provisions of article VII, section 6.

Because article VI, section 7, addresses election of judges only, a narrow range of offices, compared to the broad reach of article VII, section 6, the former is the more specific provision that controls the more general latter provision. Therefore, the grant of authority to the legislature to determine the manner of electing judges is not strictly limited by the provisions of article VII, section 6. Although the legislature's authority is not boundless, *cf. State ex rel. Nordin v. Erickson,* 119 Minn. 152, 156, 137 N.W. 385, 386 (1912), the challenged provisions of Minn.Stat. § 480A.02, subd. 3, do not exceed its scope.

For the reasons stated, all of petitioner's claims are without merit. The petition is therefore denied.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of

the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (concurring).

While I agree with the court's analysis and conclusion, I write separately to say that it is not clear to me that the petition before us sets out a viable equal protection claim. As part of determining whether a party is being denied equal protection of the laws, it is necessary to determine whether the class at issue involves similarly situated people. Only when the class involves similarly situated people are the laws required to treat those people the same. *See Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' But so too, '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' ") (citations omitted). Obviously, if the people are not similarly situated there is no equal protection claim in the first instance and there is no need to engage in a discussion about the appropriate standard of review and how that standard is to be applied.

Petitioner asserts that when an incumbent court of appeals judge and a private citizen are seeking election to the same court of appeals congressional district seat they are, for purposes of equal protection, similarly situated. That assertion is not supported by the reality of their different circumstances. First, challengers and incumbents in judicial elections have very different obligations based upon the incumbent's duties under the Minnesota Code of Judicial Conduct. This court has stated that "[t]he role of a judge in the administration of justice requires adherence to the highest standard of personal and official conduct. * * * A judge, therefore, has the responsibility of conforming to a higher standard of conduct than is expected of lawyers or other persons in society." *Complaint Concerning Winton*, 350 N.W.2d 337, 340 (Minn.1984). Thus, an incumbent judge has duties not borne by her challenger and must remain faithful to that duty throughout her tenure on the court, including during the electoral process. Second, an incumbent judge seeking reelection to a designated congressional district seat has assumed the obligations that accompany service on the court of appeals. For example, the incumbent judge must relinquish all ties to her former law practice, relocate herself and her family to the Twin Cities area, and forgo the opportunity to run for a different elected office unless she resigns her court of appeals seat.[1] A challenger seeking the same seat, however, is not required to relocate and continues to enjoy the opportunity to engage in the practice of law and may seek any elected office he so chooses without having to give up his livelihood.

Thus, the circumstances of incumbents and challengers are different in fact and the Constitution does not require that they be treated in law as though they were the same. *Plyler*, 457 U.S. at 216, 102 S.Ct. 2382 ("The Equal Protection Clause di-

---

1. Petitioner's argument raises the following question: Why would a successful attorney accept an appointment to a court of appeals congressional district seat knowing that she would have to give up her law practice, either relocate herself and her family to the Twin Cities metro area to fulfill her court obligations or commute long distances for which she would not be reimbursed after two years, *see* Minn.Stat. § 484.54 (2002), and, if she relocated or the congressional district boundaries changed, be ineligible for election to the seat? The likely answer is that she would not accept the appointment.

rects that 'all persons similarly circum-
stanced shall be treated alike.' ").